**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FIKRETA CENANOVIC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:20-CV-07612 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| HAMDARD CENTER FOR HEALTH | ) | |
| AND HUMAN SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Fikreta Cenanovic filed this lawsuit alleging that her former employer, Hamdard Center for Health and Human Services, committed unlawful disability discrimination when it terminated her employment. R. 1, Compl. at 1.[1] Cenanovic was a case manager for Hamdard for many years but was dismissed from the job after suffering a slip and fall at work that precipitated various health challenges. Compl. ¶¶ 17–31. Hamdard now moves for summary judgment. R. 45, Def.'s Mot. Summ. J. For the reasons detailed in this Opinion, Hamdard's motion is granted because no reasonable jury could find that Cenanovic is a qualified individual under the Americans with Disabilities Act, 42 U.S.C. § 12112(a).[2]

---

[1] Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2] The Court has subject matter jurisdiction over this case under federal-question jurisdiction. 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the common law claim for retaliatory discharge in this case under 28 U.S.C. § 1367, because it arises from the same case or controversy as the federal claims.

## I. Background

In deciding Hamdard's summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts below are undisputed unless otherwise noted.[3]

Hamdard is a non-profit community health center that provides healthcare and support services in the Chicago area. R. 45-2, Def.'s Statement of Material Facts (DSOF) ¶ 1; R. 45-3, Exh. 6, Bailey Aff. ¶ 4. Fikreta Cenanovic worked as a full-time case manager at Hamdard from July 1, 2009, through November 30, 2018. DSOF ¶ 2; Compl. ¶¶ 7–9. Her "at-will" employment required that she sign, on multiple occasions, a receipt acknowledging that she had read Hamdard's Employee Manual. DSOF ¶¶ 6–9; R. 45-3, Exh. 4(a)–(b); R. 53, Pl.'s Resp. DSOF ¶¶ 6–9. In August 2018, Cenanovic was injured at work when she slipped and fell on a wet floor. DSOF ¶ 10; R. 45-3, Exhs. 7, 8(a); Pl.'s Resp. DSOF ¶ 10. Cenanovic's injuries included neck pain, a lower back contusion and sprain, headaches, numbness, and tingling sensations, among others. DSOF ¶ 11; R. 45-3, Exh. 8(b); Pl.'s Resp. DSOF ¶ 11. The following

---

[3] As a threshold matter, Hamdard argues that parts of Cenanovic's response to Hamdard's L.R. 56.1(b)(3) Statement of Facts should be struck. R. 54, Def.'s Reply at 3–4. Hamdard argues that many of Cenanovic's exhibits are not cited in her response brief, R. 52, or her response to Hamdard's statement of facts, R. 53, and thus should be stricken. In upcoming footnotes in this Opinion, the Court addresses the admissibility of Cenanovic's proffered exhibits to the extent those exhibits are necessary for this Opinion. Hamdard also argues that Cenanovic presents a series of argumentative denials that fail to cite to specific evidentiary materials to justify these denials. Although the Court appreciates the importance of parties pointing to the record for support when issuing factual denials, summary denials are sometimes inescapable where the characterization of evidence is so closely tied to the litigants' underlying merits arguments.

week she submitted a doctor's note to her supervisor at Hamdard, Kiran Siddiqui, along with a workers' compensation claim filed on August 28, 2018. DSOF ¶ 12; R. 45-3, Exhs. 7(a), 8(a); Pl.'s Resp. DSOF ¶ 12. That same day, Cenanovic began taking her job-protected medical leave under the Family and Medical Leave Act (commonly known as the FMLA). *Id.*

In the first week of September 2018, Cenanovic sent Hamdard a successive note from her doctor requesting that she be excused from regular work attendance through October 6, 2018. DSOF ¶ 13; R. 45-3, Exh. 10; Pl.'s Resp. DSOF ¶ 13. The days that followed featured various attempts to engage Cenanovic and her workers' compensation representative, Jennifer Robinson, to establish a modified or light duty work schedule. DSOF ¶¶ 14–17; R. 45-3, Exh. 12(a), (b); Pl.'s Resp. DSOF ¶¶ 14–17.[4] One attempt included faxing a modified work form to Robinson on September 12, 2018, which provided what Hamdard conceived as a feasible light duty work regimen. Exh. 12(a). But the form was never signed and returned by Cenanovic's physician. *Id.* Although Cenanovic disputes that she received an offer of modified work, she does not dispute that this form was faxed to her legal counsel or, ultimately, shared with her. Pl.'s Resp. DSOF ¶¶ 14–17. Neither Cenanovic nor her representative responded to Hamdard's attempts to discuss modified work for Cenanovic in September. *Id.*

---

[4] Cenanovic objects to the factual allegation that modified or light duty work was ever "offered" to her by Hamdard. Pl.'s Resp. DSOF ¶¶ 14–17. There is no need to conclusively decide this issue because the dispositive analysis does not turn on it, but it is worth noting that Hamdard did make various attempts to contact Cenanovic (through her representative) to initiate coordination on a modified or light duty work schedule.

On October 1, 2018, Hamdard left a voicemail for Cenanovic asking if, consistent with her previous doctor's note, she would return to work on October 6. DSOF ¶ 18; Bailey Aff. ¶ 15; Pl.'s Resp. DSOF ¶ 18. In response, Cenanovic emailed Hamdard a third doctor's note, this time asking that she be excused from regular work attendance through November 7, 2018. DSOF ¶ 19; R. 45-3, Exh. 11; Pl.'s Resp. DSOF ¶ 19. In an email on October 19, 2018, Siddiqui (1) informed Cenanovic that Hamdard had received her third doctor's note excusing her from regular work attendance through November 7; (2) reminded Cenanovic of the light duty work form that the company had faxed to Robinson a month earlier (to which no response had been received yet); and (3) noted that Cenanovic's FMLA leave would expire on November 12, 2018. DSOF ¶ 21; Exh. 11; Pl.'s Resp. DSOF ¶ 21. On the same day that this email was sent to Cenanovic, her supervisors at Hamdard emailed Cenanovic's medical case manager at Travelers Insurance (which was Hamdard's workers compensation representative), informing Travelers that if Cenanovic were to submit a fourth doctor's note excusing her beyond the FMLA expiration of November 12, her "position will be filled." R. 53, Exh. 6.

Around three weeks passed. On November 8, 2018, Cenanovic submitted a fourth doctor's note asking for continued excusal from regular work attendance, this time through December 12, 2018. DSOF ¶ 23; R. 45-3, Exh. 14; Pl.'s Resp. DSOF ¶ 23. At this point, Cenanovic understood her FMLA leave would expire by November 12. DSOF ¶ 24; R. 45-3, Exh. 2 ¶¶ 3, 6, 8; Pl.'s Resp. DSOF ¶ 24. She did not return to work on that date. *Id*. Hamdard then contacted the Travelers case manager

overseeing Cenanovic's case to inquire about her return-to-work plan before making any final decisions on her employment. DSOF ¶ 27; R. 45-3, Exh. 15; Pl.'s Resp. DSOF ¶ 27. Aside from the fourth doctor's note of November 8, it appears there was no additional follow up by Cenanovic with Hamdard about the status of how or when she would be able to return to work. The modified work form faxed to Robinson on September 12, 2018, and referenced by Cenanovic's supervisor in the October 19, 2018 email, had not triggered a response by Cenanovic. Instead, on November 27, 2018, Cenanovic's physician wrote and submitted to Hamdard another note requesting that Cenanovic be excused from work for an additional four weeks. DSOF ¶ 28; Exh. 15; Pl.'s Resp. DSOF ¶ 28. Although this note said that Cenanovic's "work status" would be discussed following the additional four weeks, the note did not set forth any specific timeline for Cenanovic's return to work nor did it engage with any portion of the modified duty form provided to Cenanovic by Hamdard. *Id.*

On November 30, 2018, Cenanovic was informed by Hamdard that it was ending her employment, citing the dissolution of her position "[d]ue to restructuring within the company." DSOF ¶ 33; R. 45-3, Exh. 16; Pl.'s Resp. DSOF ¶ 33. Neither party alleges that Cenanovic was informed that her position was in danger of being eliminated due to a reorganization within the company before she was terminated. Hamdard maintains that it understood Cenanovic was not planning to return to work in the foreseeable future, even after her FMLA leave had expired. DSOF ¶ 32; Bailey Aff. ¶¶ 18–20; Exh. 11, 11(a). Hamdard requires its employees who take leaves of absence to obtain clearance to return to work. DSOF ¶ 34; Bailey Aff. ¶ 21. At the

5

time of her employment termination, Cenanovic could not apply and complete training for another position at Hamdard because she had not received clearance from her own physician to return to work. Bailey Aff. ¶¶ 7, 8, 9, 21, 23.

In mid-December 2018, Cenanovic filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission, alleging ADA discrimination and retaliation. Compl. ¶ 39, Exh. C. She was not released to return to work until an independent medical examiner found that she was fit for duty on May 6, 2019. R. 45-3, Exhs. 13(a), (b). When asked during her EEOC intake interview about the basis for her claim, Cenanovic acknowledged that she could not return to work at the time of her firing, "but when they fired me they didn't know that." DSOF ¶ 38; R. 45-3, Exh. 18; PSOF ¶ 38. The EEOC found no reasonable cause for the charge, R. 53, Exh. 5, and Cenanovic filed this lawsuit.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011),

6

and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Cenanovic brings claims of disparate treatment and failure to accommodate in violation of the ADA, as well as a claim for retaliatory discharge under Illinois law. Compl. ¶¶ 42–56. Hamdard moves for summary judgment on all claims, arguing (among other things) that Cenanovic is not a "qualified individual" under the ADA and lacks evidence to show that her discharge was caused by her exercise of workers' compensation rights. Def.'s Mot. Summ. J.

### A. ADA Claims

### 1. Qualified Individual

The Americans with Disabilities Act makes it unlawful for an employer to "discriminate against a *qualified individual* on the basis of disability." 42 U.S.C. § 12112(a) (emphasis added). Specifically, an employer cannot fail to make reasonable accommodations to qualified individuals nor deny them employment opportunities because of their disability. *Id.* § 12112(b)(5)(A), (B) The ADA goes on to define

7

"qualified individual" as a person who "with or without reasonable accommodation, can perform the *essential functions* of the employment position ...." *Id.* § 12111(8) (emphasis added). Cenanovic claims that Hamdard failed to accommodate her disability, refused to allow her to return to work, and terminated her employment because of her physical disability. Compl. ¶¶ 42–48.

To prevail on the accommodation claim, Cenanovic must show: "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job either with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (cleaned up).[5]

The parties agree that Cenanovic was regarded as disabled within the meaning of the ADA, because she was suffering from physical impairments that substantially limited major life activities following her workplace injury. 42 U.S.C. § 12102(1); DSOF ¶¶ 10–12; Pl.'s Resp. DSOF ¶¶ 10–12. The parties diverge on whether Cenanovic was a "qualified individual" who could perform the essential functions of her job.

Hamdard's primary contention is that Cenanovic was unable to work *at all* after her job-protected leave ended in early November 2018, so she was not a "qualified individual" under the ADA. R. 45-1, Def.'s Mem. at 6. Hamdard points out that

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Cenanovic filed a workers' compensation claim for total disability benefits and took FMLA leave that was extended multiple times. *Id.*; DSOF ¶¶ 12–13, 19, 21, 23; Pl.'s Resp. DSOF ¶¶ 12–13, 19, 21, 23. A modified duty form was faxed to Cenanovic's workers' compensation attorney, Jennifer Robinson, by Hamdard's workers' compensation insurer, Travelers, in mid-September 2018. DSOF ¶¶ 14–16; Pl.'s Resp. DSOF ¶¶ 14–16. Yet this form went unanswered by Robinson and Cenanovic for months, even as Hamdard repeatedly attempted to confirm when Cenanovic planned on returning to work. DSOF ¶¶ 17, 19; Pl.'s Resp. DSOF ¶¶ 17, 19. On September 26, 2018, Robinson emailed Travelers case manager Jonathan Sobkowiak with a summary of Cenanovic's visit with her orthopedic physician the day before—but the email mentioned nothing about the modified work form. R. 45-3, Exh. 8(b). Cenanovic was also reminded in a mid-October 2018 email from her supervisor, Kiran Siddiqui, that her FMLA leave would end on November 12. DSOF ¶ 21; Exh. 11; Pl.'s Resp. DSOF ¶ 21. Instead of returning to work by the FMLA lapse date, she submitted another doctor's note on November 8, 2018, asking to be excused from regular work attendance for another four weeks. DSOF ¶ 23; Exh. 14; Pl.'s Resp. DSOF ¶ 23. But Cenanovic's submission omitted any response to the modified duty form, confirmed she would not be returning to work after her FMLA leave expiration, and provided neither her employer nor her workers' compensation case manager with any time frame of when she might return to work. DSOF ¶ 27; Exh. 15; Pl.'s Resp. DSOF ¶ 27. She sought another leave-extension request in the final doctor's note submitted on November 27, 2018, which requested another month away from all work duties. DSOF ¶ 28; Exh. 15; Pl.'s

9

Resp. DSOF ¶ 28. Hamdard inferred that Cenanovic would not soon return to work and that the timeline for her receipt of necessary medical clearance to make that return was effectively open-ended. DSOF ¶¶ 32–35; Pl.'s Resp. DSOF ¶¶ 32–35. Hamdard terminated Cenanovic's employment three days after submission of this last doctor's note. DSOF ¶ 33; Exh. 16.

In opposing summary judgment, Cenanovic maintains that her job termination violated the ADA because it rested on Hamdard's purportedly misguided inference that she "could not work at all for over six months after her job-protected leave ended in November 2018." R. 52, Pl.'s Resp. at 9–10 (emphasis omitted). Cenanovic argues that the proper determination as to whether someone is a "qualified individual" must be made at the time of the employment decision. Pl.'s Resp. at 10 (citing *Collier v. City of Chicago*, No. 08-cv-5645, 2011 WL 2009925, at *5 (N.D. Ill. May 23, 2011)). That is of course right. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996) ("The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." (cleaned up)). But even so, Cenanovic must still proffer enough evidence for a reasonable jury to find that she was a qualified individual when she was fired, an element of the ADA claim on which she bears the burden of proof. *Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1998) ("The plaintiff bears the burden of proof on the issue of whether [she] is a 'qualified individual' under the ADA." (cleaned up)). Specifically, Cenanovic must present evidence that as of November 30, 2018, she both possessed the necessary skills to perform her job, *see* 29 C.F.R. § 1630.2(m), and—

more importantly—that she was "willing and *able* to demonstrate these skills by coming to work on a regular basis." *Nowak*, 142 F.3d at 1003 (cleaned up) (emphasis added).

On the record evidence, no reasonable jury could find that Cenanovic was a qualified individual under the ADA. This is so for two reasons. First, even when the evidence is viewed in Cenanovic's favor, her job position at Hamdard was eliminated due to the health facility's restructuring of its work force, which required her to undergo additional training to transition into the newly minted role of Patient Support Specialist.[6] But she did not apply, nor did she complete any training for this role, which means that she did not satisfy the requisite job-related requirements of the position. Bailey Aff. ¶¶ 7–9. Cenanovic objects that Hamdard never offered her an opportunity to apply for or train towards any new position after eliminating her previous role. Pl.'s Resp. DSOF ¶ 31. But Hamdard "would have provided" Cenanovic with said opportunity—"had she returned to work." DSOF ¶ 31. As discussed earlier, Cenanovic's return to work was not on the foreseeable horizon. Also, to prevail on a

---

[6] Hamdard uses the terms "Patient Support Specialist" and "Patient Case Coordinator" interchangeably for the new role that absorbed the responsibilities of Case Manager. *Compare* R. 53, Exh. 4, EEOC Position Statement ("Current roles in Health Navigation, Case Management, and Outreach and lack thereof, were blended together into a Patient Support Specialist position []. Ms. Cenanovic was let go from her role as Case Manager as her job duties and translation services were absorbed by other job descriptions and roles in the Patient Support Specialist Role."), *with* R. 45-3, Exh. 5, Def.'s Resp. to Interrog. at 8–9 ("Defendant states that Plaintiff never applied for a Patient Care Coordinator position, and she did not have the training to work on the medical side. Plaintiff never returned to her job when her FMLA leave ended so she necessarily failed to meet the expectations of Patient Support Specialist."). For convenience's sake, this Opinion adopts the term that Hamdard used in its EEOC position statement, that is, Patient Support Specialist.

11

claim that she should have been reassigned, Cenanovic must show that there was a vacant position for which she was qualified. *See Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 750 (7th Cir. 2011). Cenanovic does not meet this burden because she does not present evidence establishing—even giving her the benefit of reasonable inferences—that there was a vacant position at Hamdard for which she qualified at the time of the termination.

Second, even if Cenanovic's position was not really eliminated on November 30, 2018, the record evidence would compel a reasonable jury to find that she was not available to work when her employment was terminated. Cenanovic knew that her FMLA leave had expired nearly three weeks before the termination. DSOF ¶ 24; Pl.'s Resp. DSOF ¶ 24. She had not engaged her employer on crafting a modified work schedule nor had she filled out and returned the modified duty form to explain her capacity to work. DSOF ¶¶ 14–16, 22; Pl.'s Resp. DSOF ¶¶ 14–16, 22. Cenanovic simply submitted periodic doctor's notes excusing her from work attendance in successive monthly intervals. DSOF ¶¶ 13, 19, 23, 28; PSOF ¶¶ 13, 19, 23, 28. Put simply, Cenanovic's return-to-work date at the time of her termination was effectively indefinite, and indefinite leave is not the type of accommodation that Hamdard was obligated to provide under the ADA. *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 ("If, as the EEOC argues, employees are entitled to extended time off as a reasonable accommodation, the ADA is transformed into a medical-leave statue—in effect, an open-ended extension of the FMLA. That's an untenable interpretation of the term 'reasonable accommodation.'")

In response, Cenanovic essentially argues that she was only seeking a "short leave of absence" which, in certain cases, is "analogous to a part-time or modified work schedule." Pl.'s Resp. at 10. Yes, that is language straight out of the pages of *Severson*, 872 F.3d at 481. Tellingly, however, the next sentence in *Severson* clarifies that "a medical leave spanning multiple months does not permit the employee to perform the essential functions of [her] job. To the contrary, the inability to work for a multi-month period removes a person from the class protected by the ADA." *Id.* (cleaned up). That is what a reasonable jury must find here, even giving Cenanovic the benefit of reasonable inferences.

Cenanovic also cites *Haschmann v. Time Warner Ent. Co.*, 151 F.3d 591 (7th Cir. 1998), for the proposition that a second medical leave of four weeks following an earlier three-week leave and a modified schedule constitutes a reasonable accommodation. Pl.'s Resp. at 10. The problem with this reliance is two-fold. First, unlike Cenanovic, the plaintiff in *Haschmann* needed brief, intermittent leave but could and *did* return to a normal work schedule. 151 F.3d at 600. Cenanovic never returned to work, did not engage her employer on coordinating a return-to-work schedule, and, in any event, was not able to work at or near the time of termination. Second, the duration of the leave sought by the employee in *Haschmann* was less than half as long—seven weeks at maximum and with a temporary return to work in between—as compared to the leave sought by Cenanovic: 18 consecutive weeks counting the request in the final doctor's note of November 27, 2018. That is not "seeking a couple weeks off," Pl.'s Resp. at 10, and distinguishes this case from *Haschmann*. *See Basden*

13

*v. Pro. Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013) (applying similar distinction).

Indeed, Cenanovic does not dispute ¶that her doctor did not release Cenanovic to return to work until May 6, 2019—five months after her job was terminated. DSOF ¶ 35; Pl. Resp. DSOF ¶ 35. Cenanovic asserts that her inability to work until May 2019 is irrelevant to the consideration of whether she was a qualified individual with a disability at the time of her discharge. Pl.'s Resp. DSOF ¶ 35; Pl.'s Resp. at 10. It is true that the scrutiny of ability to work is made at the time of the adverse employment action—but facts learned *after* that time can have a tendency to show what the state of affairs were at the *earlier* time. The fact that Cenanovic's doctor did not release her for work until May 2019 is relevant (indeed powerfully relevant) to whether Cenanovic was able to work at the time she was fired. If the evidence reveals, as it does, that Cenanovic was an employee who needed long-term medical leave and could not work, then she is not a qualified individual under the ADA. *Severson*, 872 F.3d at 479 (citing *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)).

### 2. Interactive Process

Cenanovic's final argument on the accommodation claims is that Hamdard failed to engage in an interactive process to determine a reasonable accommodation that would have enabled her to return to work. Pl.'s Resp. at 11. Ordinarily, when a disabled worker communicates her disability to her employer and asks for an accommodation, the employer has the burden of interacting with the worker on crafting a reasonable accommodation. *See Hansen v. Henderson*¸ 233 F.3d 521, 523 (7th Cir.

14

2000) (collecting cases). So, even though an employee bears the burden of showing that a reasonable accommodation existed and that she asked for one, Pl.'s Resp. at 11, Cenanovic argues that in this case Hamdard failed to engage in the required interactive process. Pl.'s Resp. at 11 (citing, among others, *Mays v. Principi*, 301 F.3d 866, 870–71 (7th Cir. 2002), *abrogated on other grounds by EEOC v. United Airlines, Inc.*, 693 F.3d 760 (7th Cir. 2012)).

But the record evidence definitively refutes—even viewing the evidence in Cenanovic's favor—that Hamdard failed to engage Cenanovic in the interactive process. Cenanovic does not deny that her lawyer received Hamdard's modified duty form in mid-September 2018, and she does not deny receiving a reminder about the form from her Hamdard supervisor, Siddiqui, in mid-October 2018. Pl.'s Resp. at 18–21. Instead, Cenanovic contends that Hamdard was not making a bona fide offer of reasonable accommodation by providing the modified duty form, and thus did not start the interactive process. *Id.* at 18–19. But it takes two to tango. The interactive process requires a back-and-forth communication between the parties. Here, Hamdard's attempts to understand what work duties Cenanovic could perform constituted the company's attempts at "soliciting her suggestions for a reasonable accommodation." *Mays*, 301 F.3d at 870. That was the start of the interactive process, and Cenanovic should have engaged Hamdard with a response to the modified duty form or, alternatively, initiated a separate discussion about reasonable accommodation instead of assuming that she could continue her multi-month leave of absence without at least trying to clarify how or when she would return to work.

For these reasons, no reasonable jury could find that Cenanovic could perform the essential functions of her Case Manager position when she was discharged. No reasonable accommodation was possible because Cenanovic was not available to return to work for many months after her FMLA leave expired. She also did not respond to Hamdard's attempts to solicit her suggestions for constructing a reasonable accommodation. Because Cenanovic was not a qualified individual under the ADA, the claims under the ADA must be dismissed.

### 3. Disparate Treatment

Given that no reasonable jury could find that Cenanovic was a qualified individual, neither the accommodation claim nor the disparate-treatment claim can survive summary judgment. The accommodation claim was addressed above, so for the sake of completeness, the Opinion also will address the disparate-treatment claim.

In addition to the qualified-individual element, Cenanovic's disparate-treatment claim requires her to offer enough evidence for a reasonable jury to find that her firing was caused—that is, motivated—by her disability. *See Monroe v. Ind. Dep't of Trans.*, 871 F.3d 495, 503–04 (7th Cir. 2017). To establish causation, Cenanovic could have relied on a prima facie "show[ing] that her employer would not have fired her, but for her actual or perceived disability." *McCann v. Badger Mining Corp.*¸ 965 F.3d 578, 588 (7th Cir. 2020) (cleaned up). But Cenanovic disclaims reliance, as she is entitled to do, on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) prima-facie framework in favor of an overall assessment of the evidence. Pl.'s Resp. at 8. "Under *Ortiz v. Werner Enterprises, Inc.*, the ultimate question in a discriminatory

16

employment termination case is 'whether a reasonable juror could conclude that the plaintiff would have kept their job if they were not disabled, and everything else had remained the same.'" *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019) (cleaned up) (quoting *Ortiz*, 834 F.3d 760, 764 (7th Cir. 2016)).

One way to prove disparate treatment is to expose the employer's proffered reasons for the termination as pretextual. *See Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737–38 (7th Cir. 2013). In evaluating pretext, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Monroe*, 871 F.3d at 505 (cleaned up). Pretext also demands "more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Id.* (cleaned up). Cenanovic offers three reasons why the explanation Hamdard gave in its termination letter was pretextual.

### a. Suspicious Timing

To begin, Cenanovic contends that the suspicious timing of her termination proves causation. Pl.'s Resp. at 13. Specifically, Cenanovic cites the confluence of three events. First, the date of termination was 18 days after the expiration of her FMLA leave. *Id.* Second, an internal Hamdard email from October 19, 2018, said that if Cenanovic submitted another doctor's note excusing her from regular work attendance, her position would be filled. *Id.* And third, Hamdard's EEOC position statement

asserted that the company discussed the restructuring of the Case Manager position in mid-November 2018.[7] *Id.*; R. 53, Pl.'s Resp. DSOF, Exh. 4.

Even when the evidence is viewed in Cenanovic's favor, these contentions do not show that the reasons offered by Hamdard amount to a "lie or a sham to cover up discriminatory motives." *Monroe*, 871 F.3d at 505. First, despite the expiration of Cenanovic's FMLA leave on November 12, 2018, and the internal email about filling her position, Hamdard did not in fact immediately terminate her employment. Instead, two days after the FMLA expiration, Hamdard followed up with Travelers via email to ask whether it had any news about Cenanovic's plans to return to work, while noting her submission of a doctor's note requesting a further absence through December 12. R. 45-3, Exh. 15. This email also stated that no "final decision" had been made about Cenanovic's employment. *Id*. After Hamdard implemented the restructuring in mid-November, Cenanovic received a termination letter on November 30, 2018, stating that her role had been eliminated. R. 45-3, Exh. 16. Given the multi-

---

[7] Hamdard challenges the admissibility of the EEOC position statement. Def.'s Reply at 3. But the position statement was also marked as Exhibit 3 of the Shawn Bailey Deposition. R. 54-3, Exh. 3, Bailey Tr. at 19:19–24:14. During the deposition, Hamdard objected to Bailey's testimony about the EEOC position statement because she was not speaking on behalf of the corporation and because it was unclear to her counsel if this was the final draft of the position statement. Neither party appears to have tried—not during the Bailey deposition, nor later in discovery—to verify whether this was indeed the final draft of the position statement submitted by Hamdard to the EEOC. Although Hamdard challenges the authentication of Exhibit 4, the company relies on the position statement throughout its reply brief and proffers no substitute exhibit or affidavit challenging the authenticity of the exhibit. Given the deposition testimony about the statement, and viewing inferences in Cenanovic's favor, the version of the position statement reflected in Exhibit 4 is admissible for purposes of summary judgment evaluation.

month leave, and the continued gap in response from Cenanovic about a return to work, Hamdard did not jump to terminate her employment.

Even if the timing of Cenanovic's discharge 18 days after expiration of FMLA leave and 41 days after the internal Hamdard email from October 19 gives rise to some suspicion, suspicious timing alone is generally not enough to survive summary judgement when "reasonable, non-suspicious explanations for the timing of termination" are otherwise proven by the record. *McCann*, 965 F.3d at 592–93 (cleaned up). Here, there is no genuine dispute that Hamdard really was undergoing a company-wide reorganization of its business, including the Case Manager position.[8] DSOF ¶¶ 29–31; Pl.'s Resp. DSOF ¶¶ 29–31. Consistent with the mid-November 2018 timeframe for restructuring discussions cited in Hamdard's EEOC position statement, Cenanovic's position was later absorbed into the Patient Support Specialist role. R. 53, Exh. 4.

### b. Shifting Explanations

Cenanovic next argues that Hamdard has offered shifting explanations for discharging her, thus giving rise to an inference of pretext. Pl.'s Resp. at 13–16. Cenanovic cites four purported inconsistencies. First, in an email exchange on October 18,

---

[8] Cenanovic objects that the restructuring of the Case Manager position did not really start until mid-November 2018, as Hamdard stated in its EEOC position statement. PSOF ¶¶ 29–31. But that is still before Cenanovic's employment was terminated, and Cenanovic offers no evidence to contradict that between 2017 and 2018, Hamdard significantly restructured its business and really did transition Case Managers into the Patient Support Specialist role. In a deposition, Cenanovic did ask Hamdard's head of hiring about the unusual two-year timespan for this transition. *See* Bailey Tr. at 46:9–47:8. But this point was not raised by Cenanovic in her response brief.

2018 between Cenanovic and supervisor Siddiqui, Hamdard pointed to the exchange as evincing "hostile behavior," Pl.'s Resp. at 14, when in fact it was not. Second, as discussed earlier, in the October 19, 2018 email between Hamdard and a Travelers representative, Hamdard declared that if Cenanovic presented another doctor's note for a leave extension, then her position would be filled. *Id*. 14–15. The third explanation proffered by Hamdard, Cenanovic says, is the organizational restructuring. *Id*. at 15. And fourth, Cenanovic characterizes Hamdard's arguments in this case as saying that she was both non-compliant with employee-attendance policies and never applied for the Patient Support Specialist role. *Id*. Although Cenanovic labels these as four separate explanations for her firing, in fact the record evidence shows that Hamdard offered a single reason—the one in her termination letter, that is, the restructuring—and the other circumstances are simply context for that decision.

At the outset, it is true that "[s]hifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) (cleaned up). Here, Hamdard has not disowned—whether in arguing this motion, presenting its EEOC position statement, or transmitting a termination letter to Cenanovic—its primary explanation that organizational restructuring caused the elimination of the Case Manager position, and with it Cenanovic's job. *Compare* DSOF ¶¶ 29–31, 33 *with* R. 45-3, Exh. 16 and R. 53,Exh. 4. The pronouncement in the October 19 email to Travelers—that is, that Cenanovic's job would be terminated if she submitted another doctor's note—did not

in fact come to fruition. Indeed, the record shows that no decision was made on her employment until after November 14, 2018. R. 45-3, Exh. 15. This explanation is consistent with the mid-November timeline for organizational restructuring proffered by Hamdard in its EEOC position statement and in the termination letter.

With regard to Hamdard's reference to hostile behavior, this issue arises from a single email in which Hamdard's recruitment manager forwarded Cenanovic's October 18 email exchange with Siddiqui to Travelers, citing displeasure with Cenanovic's tone and asking Travelers for "options." Pl.'s Resp. at 14 (citing R. 45-3, Exh. 11). But nothing came of that, as confirmed by the absence of any evidence of follow up to that request, and Bailey disclaimed that hostile behavior was a basis for the termination. R. 54-3, Exh. 3, Bailey Tr. at 35:13–41:20. Yes, Hamdard's *attorneys* have at times invoked this purportedly hostile email exchange in the summary judgement filings. Def.'s Mem. at 2; DSOF ¶ 20. But the references are gratuitous; the briefs do not actually cite hostility as a reason for Cenanovic's discharge. If anything, the email exchange is cited to support Hamdard's argument that Cenanovic preferred not to be contacted directly for follow-on work requests while on leave—a request she explicitly makes in the text of her email response to Siddiqui. R. 45-3, Exh. 11(a); *see also* Bailey Tr. at 53:7–9, 75:3–13.

Lastly, Cenanovic's extended absence and indefinite absence into the future were not offered by Hamdard as a free-standing, independent reason for her termination. Instead, those facts explain why, after the elimination of the Case Manager position in November 2018, Hamdard did not invite Cenanovic to apply for a

transitional role—she was on an open-ended absence. It is true that Hamdard could have been clearer on this point in the termination letter and in the EEOC position statement. But that does not mean that a reasonable jury could find that Hamdard has "shifted" its explanation for the termination.

All in all, even viewing the evidence in Cenanovic's favor and even considering all of Cenanovic's arguments together—purportedly suspicious timing and allegedly shifting explanations—no disparate treatment could be found by a reasonable jury.

### c. Similarly Situated Employees

One final point is worth making on the ADA claims. Earlier in the litigation, Cenanovic alleged in the Complaint that hers was the only Case Manager position terminated and that the other Case Managers were still employed by the company. Compl. ¶¶ 37–38. That indeed would have been important circumstantial evidence that the purported restructuring was a pretext. But now with discovery in the books, Cenanovic does not provide any corroborating evidence for this allegation. Her response brief simply refers back to the Complaint—which is not evidence—and otherwise disclaims the need to show that there were similarly situated employees who were treated differently. Pl.'s Resp. at 16.

### B. Retaliatory Discharge

### 1. Supplemental Jurisdiction

The final question is whether to retain supplemental jurisdiction over Cenanovic's common law claim for retaliatory discharge, and if so, whether that claim survives summary judgment. Ordinarily, when all federal claims are dismissed from a

case, "there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (per curiam). Indeed, this presumption is statutorily expressed in 28 U.S.C. § 1367(c)(3), which provides for the discretionary relinquishment of jurisdiction over state claims when the claims providing original jurisdiction (here, federal-question jurisdiction) have been dismissed. Here, however, neither side asks this Court to relinquish supplemental jurisdiction over the retaliatory-discharge claim. And "when difficult and unsettled state law issues are not implicated by the [supplemental] claims, it is entirely acceptable under the discretionary principle for a federal court to decide those claims even after dismissing the main claim." *Timm v. Mead Corp.*, 32 F.3d 273, 276–77 (7th Cir. 1994) (cleaned up). Here, the retaliatory-discharge claim is governed by straightforward legal principles; the litigation is over three years old; and the parties have completed discovery. There is "no need to delay the resolution of this matter … by having the parties litigate the unspectacular state law issues anew in state court." *Id*.

### 2. Causation

The Illinois Workers' Compensation Act establishes a comprehensive procedure to compensate employees injured on the job. *See* 820 ILCS 305/1 *et seq*. The Illinois Supreme Court recognizes a common law claim for retaliatory discharge where an employee is fired because of her actual or anticipated exercise of workers' compensation rights. *See Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357 (Ill. 1978). To prevail on a claim of retaliatory discharge, Cenanovic must prove three elements: "(1)

that [she] was an employee before the injury; (2) that [she] exercised a right granted by the Workers' Compensation Act; and (3) that [she] was discharged and that the discharge was causally related to [her] filing a claim under the Workers' Compensation Act." *Beatty v. Olin Corp.*, 693 F.3d 750, 753 (7th Cir. 2012) (cleaned up).

If an employer fired an employee based on a "valid, non-pretextual reason," then the employee cannot prevail on a retaliatory-discharge claim. *Carter v. Tennant Co.*, 383 F.3d 673, 678 (7th Cir. 2004). In analyzing an employer's proffered reason for termination, the question again is the honesty of the reason. *See McCoy v. Maytag Corp.,* 495 F.3d 515, 522 (7th Cir. 2007). Here, as discussed extensively above, Hamdard maintains that Cenanovic's Case Manager position was eliminated, so Cenanovic could not work at all when this restructuring decision was made, and her job thus was terminated for valid and non-pretextual reasons. Def.'s Reply at 15–16. Cenanovic argues that the termination was based on her exercise of her workers' compensation rights. Pl.'s Resp. at 21–22.

This dispute is a replay of the dispute over whether Hamdard terminated Cenanovic's employment due to the restructuring of the Case Manager position. Just as the record evidence showed that the restructuring led to the termination for purposes of the ADA claim, the same holds true for the retaliatory-discharge claim. Indeed, Cenanovic does not dispute that her fellow Hamdard employees who filed workers' compensation claims—including one who filed contemporaneously with Cenanovic—returned to work and kept their jobs. DSOF ¶¶ 41–44; Pl.'s Resp. DSOF ¶¶ 41–44.

24

## IV. Conclusion

Hamdard's motion for summary judgment, R. 45, is granted on all claims.

ENTERED:


     s/Edmond E. Chang     
Honorable Edmond E. Chang
United States District Judge

DATE: March 28, 2024